ROANE, Judge.
This may truly be said, to be an important cause. The consequence of a decision either way, may be greater than I can foresee or estimate. Less expe *373 rienced than my brethren in the laws of this country, and less acquainted with the former adjudications, I am less capable than they to calculate the probable effects, which will, flow from our present decision. Their superior lights and more mature experience, better enables them to know what has been the understanding of this country, on the present subject; and what are the beacons, by which our countrymen have governed themselves, in regulating their transactions, relative to the point in question. Sincerely hoping, that the present decision may be the least injurious in its consequences, and the least productive of litigation, it gives me great pleasure to believe, that the opinion I now deliver, after the most mature deliberation, best answers that description ; and best accords with tlie general understanding of our fellow citizens. My own observation on the subject is entirely corroborated, by the testimony of some of my brethren ; in whose observation, talents and experience I have the highest confidence.
Yet let me not be supposed to take refuge for the support of my opinion, merel3 on the general understanding of the people, through a long series of time; my conclusions are derived from a deliberate consideration of the acts of Assembly themselves, taken conjunctly with the principles of the common law; and from a consideration, how far there have been decisions in this country affecting this case, "so as to become fixed rules of property. For I have ever been of opinion, that such rules ought not, to be lightly departed from; and that *they cannot be, without producing extensive evils and injustice.
The case has been rightly divided by the counsel into two general questions.
1. Whether a possession of the slaves in dispute was necessary to have been in the father of the appellee Wilhelmina, who was the former husband of one of the appellants, in order to enable the appellees to recover? For, if not, there is an end of the case. But, if otherwise, then,
2. Whether-such possession did actually exist in the present case or not?
The first of these two questions may again be considered, under two points of view; 1. Under our acts of Assembly, and the principles of the common law: 2. Under the decisions in this country.
The acts of Assembly embraced, by the first view, are those of 1705, and 1727.
The first of those acts declares, that slaves shall be held, taken and adjudged to be real estate, and not chattels; and shall descend to the heirs and widows of persons dying intestate, according to the manner and custom of lands of inheritance held in fee simple. It further goes to specify certain cases, in which slaves are assimilated to chattels; and which form an exception to the general clause first stated.
Next came the act of 1727, which is entitled an act to explain and amend the former. Before we go, particularly, into this act, it may be necessary to fix its character. If it were merely an explanatory act, a question might arise, how far a court -could depart from the literal expression, as it was a Legislative constfuction of the words of a former statute; and the ancient doctrine was, that the court, on such a statute, was tied down to the letter? But the better opinion seems to be, that such statute may now receive even an equitable Construction, arising therefrom, on a general view of the whole act. 6 Bac. abr. 388. But this statute is also an amendatory statute. It changes the old statute, and introduces new principles; such as neither a judicial or Legislative construction could possibly have reduced from the former act. This is so evident to every body, that I need not cite particular examples. This statute of 1727 stands, then, on the same footing, as to its construction, with statutes in general; and the general rules for construing statutes properly apply to it. Some of these rules, which I shall presently have occasion to mention, authorize even an equitable con-siruction of a statute, under certain circumstances; but I disclaim a resort to an equitable construction, in the present instance, as wholly unnecessary; and found my opinion, entirely, upon a just view of the legal construction of the whole act, under the influence of the rules of construction, before alluded to.
I will now read the title and the first four sections of the act of 1727; which are as follows:
“An act to explain and amend the act for declaring the Negro, Mulatto, and Indian Slaves, within this Dominion, to be real estate; and .part of one other act, intituled an act for the distribution of intestates estates, declaring widows rights to their deceased husbands estates, and for securing orphans estates.
“I. Whereas the act made in the fourth year of the reign of the late Queen Anne, declaring the Negro, Mulatto, and Indian Slaves, within this Dominion, to be real estate, hath been found by experience very beneficial for the preservation and improvement of estates in this Colony, yet many mischiefs have arisen, from the various constructions, and contrary judgments and opinions, which have, been made and given thereupon, whereby many people have been involved in law suits and controversies, which are still like to increase: For remedy whereof, and to the *'end the said act may be fully and clearly explained and amended.
“II. Be it enacted, by the Lieutenant Governor, Council, and Burgesses, of this present General Assembly, and it is hereby enacted, by the authority of the same, that the said act shall hereafter be construed, and the true intent and meaning thereof is hereby declared, to be, in the several cases herein after mentioned, as the same is herein after expressed and declared, and not otherwise, that is to say:
“III. Whenever any person shall by bargain and sale, or gift, either with or without deed, or by his last will and testament in writing, or by any nuncupative will, bargain, sell, give, dispose, or bequeath, any slave or slaves, such bargain, sale, gift, or bequest, shall transfer the absolute property of such slave or slaves to such person or persons to whom the same shall be so sold, given, or bequeathed, in the same manner *374 as if such slave or slaves were a chattel; and no remainder of any slave or slaves shall or may be limited-by any deed, or the last will and testament in writing, of any person whatsoever, otherwise than the remainder of a chattel personal, by the rules of the common law, can or may be limited, except in the manner herein after mentioned and directed.
“IV. And that where any slave or slaves have been or shall be conveyed, given, or bequeathed, or have or shall descend to any feme covert, the absolute right, property and interest, of such slave or slaves, is hereby vested, and shall accrue to, and be vested in, the husband of such feme covert; and that where any feme sole is or shall be possessed of any slave or slaves,' as of her own proper slave or slaves, the same shall accrue to, and be absolutely vested in, the husband of such-feme, when she shall marry.”
*The contrary constructions and opinions arising under, and the law suits produced by the act of 1705, are evils intended to be’remedied, by this act. -Two constructions of the 4th clause are now contended for, as relative to the present case: One which throws negroes into the class of chattels, and subject to the legal rules, doctrines and decisions upon that subject: The other, leaving them neither in 'the class of real or personal property in the respect in question; and consequently without any legal doctrines, or decision's, to govern them. By which of those constructions will the declared object of the Legislature, as above, be best answered? Certainly by the former.
It seemed conceded in fhe argument, that if this case had stood singly upon the third clause, possession would then have been necessary in the husband, as falling within the general doctrine of Chattels personal; but that what are supposed the emphatical words of the fourth clause, could have been inserted for no purpose, if not to dispense with such possession.
My answer -is, 1. That those emphatic words mean nothing more, than would have been inferred from the general words of the 3d clause. ■ 2. That if they did,- yet there was a good reason for inserting them, to answer which they were inserted; and therefore, 'need not be construed, to dispense with possession; nor to infringe the doctrine of the common law.
On the first point, I will call to my aid two rules of construction:
1. That words and phrases, whose meaning have been ascertained in a statute, when used in a subsequent statute, are to be used in the same sense. 6 Bac. abr. 379; and clearly the same inference will follow, as between two clauses of the same statute. 2. That if a statute use a word, the meaning of which is well known at the common law, the word shall be -used in the same sense in the statute. 6 Bac. abr. 383. ' '
*In applying the first rule to the present case, I must observe that the same words absolute property are used in the third clause; which, 'standing singly, would confessedly not dispense with possession, as thereupon slaves stand precisely on the footing of chattels, by the common law. Those who may incline to bring the changes on the words absolute right, property and interest, in the fourth clause, are reminded, that none of those words are more emphatical, or extensive, than the words used in the third clause above mentioned ; and that the word interest was most probably inserted therein, to comprehend limited rights of the wife; that is to say, those where'she had not the absolute property.
In applying the second rule to this case, I will beg leave to read a passage from 2 Black. 433.
“A sixth method of acquiring property in goods and chattels is by marriage; whereby those chattels, which belonged formerly to the wife, are by act of law vested in the husband, with the same degree of property and with the same powers, as the wife, when sole, had over them.
This depends entirely on the notion of an unity of person between the husband and wife ; it being held that they ate one person in law, so that the very being and existence of the woman is suspended during the cov-erture, or entirely merged or incorporated in that of the husband. And hence it follows, that Whatever personal property belonged to the wife, before marriage, is by marriage absolutely vested in the husband. In a real estate, he only gains a title to the rents and profits'during coverture; for that, depending upon feodal principles, remains entire to the wife after the death of her husband', or to her heirs, if she dies before him; unless,'by the birth of a child, he becomes tenant for life by the curtesy. But, in chattel interests, the' sole and absolute property vests in the husband, to be disposed of at his pleasure, if he chuses to take possession of them; for, unless he ^reduces them to possession, by exercising some act of ownership upon them; no property vests in him, but they shall remain" to the wife, or to her representatives, after the coverture is determined.”
This passage I shall hereafter refer to, as giving the most modern and perspicuous explication of the doctrine on this subject; at present, I only wish it to be remarked, that the personal ¡property of a wife is said to be absolutely' vested in the husband,, at the same instant, that it is declared, that if he does not reduce them' into possession, during the coverture, they shall remain to the wife if she survives him. Here, then, is a decisive quotation,' from an eminent and accurate writer on the common law; shewing that the words, absolute’ propert3 in the husband, are not to be construed, as dispensing with possession in the case of chattels. ' .
The third section of the act of 1727 has. used the same words in the same sense; and the meaning of t'he same words in tlie third section, and in Blackstones treatise, under the influence of the two rule's I have stated ; both of which entirely accord, with sound reason, and pointedly apply. Let us then hear no more of the stress laid upon what are called these emphatical words; especially, in opposition to the general spirit and purpose of the act.
*375 But I have said, that if these words should even be considered, as being more extensive than I suppose, j'et there was a good reason for making them so, and consequently they ought to be restricted to answer that end, and not kept up in such enlarged sense, so, as in other respects to conflict with the other parts of the act, and the doctrines of the common law.
It will here be remarked, that slaves coming by descent are not declared to be, or to go as chattels by the third clause. They therefore are, or at least might have reasonably been supposed, by the Legislature, to remain real estate, as under the act of 1705; being such, the husband, but for this clause, which expressly extends to slaves coming *by descent &c. would only have the same limited interest, in such slaves, as descended to his wife during coverture, as he would have had in her lands ; viz : the right of receiving their profits. It might therefore have been, to enlarge his interest in the slaves coming by descent, beyond what would have been the case, under the general words of the 3d clause, that these words absolute right &c. were put in, as being contra-distinguished, from the limited right, he would otherwise have had-in such slaves.
These reasons are conclusive, with me, as to the construction of the act, admitting the words to be as extensive as is contended for, a reason is hereby assigned for it; and being thereby justified we ought there to stop; and not give them, as to other cases, a meaning, which they have not in the most approved treatises of the common law ; which they have not in another clause of the same act; and which thej cannot have without infringing the reason and symmetry of the common law, and introducing the uncertainty and litigation, which it is the declared object of the act to prevent.
Some stress may also be laid on the words, hereby vested &c. The answer is, that these words relate to the whole act and not to this single clause; and that in its construction we are as much bound by the principles of the common law, adopted by the third clause of the act of Assembly, as by the very expressions of the act itself.
Wherefore, then, it is asked was this 4th clause put in, if in the present instance it is to have no greater effect, than the general provisions of the third clause would have had, without it? The answer is, 1. To take in the case of slaves descending, as above stated: 2. To declare for greater certainty, the law in this instance. The latter parts of both the third and fourth clauses, relative to remainders, and to the case of femes sole are also *put in, for the latter reason, although every thing therein enacted, would unquestionably have followed independent of them, from the general position laid down in the 3d clause.
It may be contended, that the third clause of the act only relates to the mode of transferring slaves, and declares that that mode, incident to chattels as contra-distinguished from real estate, shall govern in the case of slaves; but that its effect stops here, and does not attach to slaves (when transferred) all the principles which appertain to chattels. The answer is, that the provision concerning remainders (over and above the clear construction of the act,) proves the contrary. The provision extends to a principle, relative to personal chattels, posterior to, and independent of the act of transfer. It was intended to conform slaves, in this respect, to the doctrine of remainders, of personal chattels; it being then doubted, if not held, that such limitations after a particular estate were void.
I will here remark, that it has some weight, with me, that the fourth section is not by way of proviso, or exception. It does not, therefore restrain the operation of the third clause, but is additional to it; and is connected, with it, by the copulative and. And the just rule of construing one part of a statute by another, 6 Bac. abr. 380; holds with great force, where one part of an act is continued by, and connected with another, by copulative words. It is also a just rule of interpretation, that a statute, continuing another with, some additional clauses, must be considered, as if the former had been recited therein. 6 Bac. abr. 382. I think this rule equally applies to a continuing of an additional clause of the same statute; and if so, the words of the third section, in .the same manner, as if such slave or slaves were a chattel, are to be considered as kept up, and repeated in the fourth section.
*1 admit that it is also a rule of construction, that general words, in one clause of a statute, may be restrained by particular words, in a subsequent clause of the same statute. 6 Bac. abr. 381. But I contend that this restriction must clearly appear to have been intended; which, I have endeavoured to shew, is otherwise in the present case.
Another rule of construction is, that where the provision of a statute is general, it is subject to the controul, and order of the common law; and that the best construction of a statute, in a doubtful case, is to construe it, as near to the rule and reason of the common' law as may be and by the course it observes in other cases; for it is not to be presumed, that the Legislature will make any alteration in the common law, except what is expressly declared. 6 Bac. abr. 383, 384.
It is also held, that such construction is to be put upon a statute, as may best answer the intention the makers had in view. 6 Bac. abr. 384: And, in the present case, the intention was to convert real property into personal in general, and not by throwing slaves out of both classes of property, as in the instance now contended for, to create a new species of property, and thereby promote law; suits, which the act purports to do away. These consequences may also be taken into consideration, supposing the law merely doubtful on this subject, to govern the court in their construction of the statute. 6 Bac. abr. 389.
I will conclude with a rule of construction, which is, that the letter of an act of Parliament may be restrained, by an equitable construction, in some cases; in others enlarged ; and in others taken contrary to the letter, 6 Bac. abr. 386. And if such be the power of a court, on a single clause of *376 a statute standing- independently, it holds a fortiori, where such single clause is consistent with the body of the act; and where an equitable construction is not required, but only a just legal exposition of the whole statute taken collectively.
*These rules of construction, founded in good sense and sanctioned by high authority, are decisive, with me, as to the construction of the present law: They are so luminous, and apply, so pointedly, to the case in question, that I forbear to make a more particular application of them.
But what good reason exists, for giving a husband surviving his wife a right to slaves accruing to her during coverture, but of which he was never in possession, more than exists as to slaves to which a feme sole is entitled, who afterwards marries? The reason assigned, in the last case, why a surviving husband cannot recover them (except in the character of her administrator) is, that the only method he had to gain possession, during the cover-ture, was by suing in his wife’s right; but as, after her death, he cannot, as husband, bring an 'action, in her right, therefore he can never, as such, recover the possession. 2 Black. 43S. This reason is supposed' equally to hold in the case of chattels accruing, during the coverture.
1 have said, that the passage, before read, from Blackstone, contains the best view of the doctrines on this subject, when he speaks (in page 435) of personal chattels in possession, he says, the husband has the absolute right thereto, not only potentially, but in fact;.leaving the inference extremely plain, indeed, that the husband, in case of choses in action, has the absolute (although only potential) right thereto. And understanding the word absolute in this sense, will at once answer some of the cases cited by Mr. Call on the subject. An attempt to cite them in the sense he contended for would be to impeach the best established principles of the law, and I confess the attempt surprised me. It is. true, the passage relied on from Blackstone relates to chattels owned by the wife, at the time of the marriáge; but there is no difference, as to- those accruing during the cover-ture. This is so plain a point, that I shall not cite authorities to shew it, except to refer to 1 Bac. abr. 481; *who says, the law gives the husband an absolute power over any personal estate accruing to her, during coverture, by gift, devise, &c. thereby clearly conforming to the doctrine before stated from Blackstone.
I have thus done with my own view of the law relative to this subject. It is fit that some notice be taken of such decisions, as have occurred, in this country, affecting the case. On this subject, I beg to be excused, from saying much, as my experience does not reach far enough back, to know much of the decisions of the old General Court. I had supposed that no question would have been made of the competency of those decisions to fix rules of property in this country; as that Court, although not the dernier resort, was at least as much so, as the Court of Kings bench in England. How far the decisions of that Court, on subjects, other than that of fixing rules of property, will bind us it is not now necessary to say; but, if we reject such rules of property as have been fixed by that court, and under which our people have regulated their property through a long series of time, the mischief, which would ensue, is incalculable. I understand, that no decision one way, or the other, can be shewn, to have ever taken place, on the very point now in question. The non existence of such a case, which must have occurred a thousand times in the space of 73 years, is a persuading circumstance, that the general opinion has always been, that slaves under the first part of the 4th clause, go as chattels, as they evidently do under the 3d clause; and as they have often been decided to do, under the latter part of the 4th, clause. The opinion of the General Court on such latter part, though not upon the very point now in question, is supposed to have given a principle, which has governed this case, and produced a general acquiescence under it. On no other ground can I possibly account for the non existence of a decision, on the very point now in question.
*In the case of Steger v. Mosely General Court October 1773, M. S. Rep. by J. Randolph 2 vol. page 322; the case under the last part of the 4th section,, was, Devise to A. for life and afterwards to B. a feme, who married C. A dies living B. and C. and then B dies living her husband, the slaves having never been reduced into possession : The question was, whether they vest in the husband, or go to the heir of' the wife, and without argument, (as often before been argued,) determined they go to the husband. Hence to be concluded, that, notwithstanding the 4th section of the act of 1727, yet negroes vest in the husband, as a chattel only; if husband survives they vest in- him as administrator of his wife (not being reduced in possession,) Squib v. Wynn, 1 Wms. 378 and, if she survives, they go to her, or her representatives. And in Bronaugh v. Cocke and Smyth v. Lucas (same reports) the law is said to be settled.
As the husband was not possessed of the slaves in this case of Steger v. Mosely, and so did not entitle himself, under the words of the 4th clause, if they were real property and not chattels, they would have descended to his wifes heirs. But this was adjudged otherwise; which could not have been, on any other ground, than that they were personal estate, under the third clause of the same act. This principle is supposed to be the one, under which the cases of Drum-mond v. Sneed, Hoard v. Upshaw and Dade v. Alexander 1 Wash, have been decided; and this principle of slaves being personal estate, under the act of 1727, although established in cases depending on a different part of the 4th clause, may justly be deemed to operate in the present case; at least as having by analogy, furnished a rule of property, in cases like the present.
As to the rectitude of the decision in those cases of Steger v. Mosely, Drummond v. Sneed &c. I*have not formed any opinion, except so far as the construction of the third clause is involved. It is sufficient to induce me to conform thereto,. *377 that they have been supposed universally to settle the law upon that subject, and have become a fixed rule of property.
I have now done with the first general question, and conclude that possession was necessary to have been in the father of the appellant Wilhelmina, to enable her to recover ; and whether such possession did exist? remains now to be enquired into.
On this point. I am clearly of opinion, from a consideration of the testimony, that if Wishart ever was in possession, at all, it was merely as a co-executor. The testimony is very full, to show the other executor to have been the acting person, and consequently to be ill possession of the estate; and very slight, as it respects the actual possession of Mr. Wishart. But possession as executor, is not sufficient. Possession in his character as husband, and in right of his wife is indispensable. Such possession, if he were a different person from the executor, could not legally be without the executors assent; but the law is the same where both characters are united in the same person. In that case an assent or election to take as devisee must be expressed or clearly implied. Otherwise his possession will be considered, as in his character of executor, according to the authority cited by Mr. .Randolph : and this general doctrine holds with greater force, under our act of Assembly; by which such possession could not legally have been given, until the end of the year.
For these reasons I think the decree in the present case, is erroneous.
FLEMING, Judge.
There are two questions in this clause; one of law, and the other of fact. The question of law is, whether, by virtue of the act of 1727, the slaves were so vested in Mr. Wishart, *as to enable him to dispose of them by his last will, without having reduced them into possession, during his life time? The question of fact is, whether, if it was necessary, that they should be reduced into actual possession, in order to enable him to dispose of them, he did, in fact, obtain such possession?
Upon the first question, it is to be observed, that by the act of 1705, slaves (except those imported for sale) were converted into real property, to all intents and purposes, under the following restrictions only, that is to say, that they were liable for payment of debts; they did not escheat for want of heirs; sales of them needed not to be recorded; they did not confer a right to vote at the election of Burgesses; they were recoverable by actions personal; and those of intestates were to be appraised, and the value divided amongst the children, to be paid by the heir at law.
Several inconveniences however, arose from this extensive conversion; and consequences, not foreseen at the making of the act, were found to result from it. To remedy which, the Legislature, in the year 1727, resumed the subject; and passed a law to explain and amend that of 17OS. In which, after reciting, that although the act of 1705 had been found very beneficial, for the preservation and improvement of estates (which appears to have been the principal object for passing both laws,) yet that many mischiefs had arisen, from the various constructions and contrary judgments and opinions, which had been made and entertained upon it, they go on to declare “that whenever any person shall by bargain and sale or gift, either with or without deed, or by his last will and testament in writing, or by any nuncupative will, bargain, sell, give, dispose or bequeath, any slave or slaves, such bargain, sale, gift or bequest, shall transfer the absolute properly of such slave or slaves, to such person or persons to whom the same shall be so sold, given *or bequeathed, in the same manner, as if such slave or slaves were a chattel; and no remainder of any slave or slaves, shall or may be, limited by any deed, or the last will and testament in writing of any person whatsoever, otherwise than the remainder of a chattel personal, by the rules of the common law, can or may be limited, except in the manner herein after mentioned and directed. ”
This clause clearly renders them personal, as to the forms of conveyances; and the 4th section following, immediately after-wards, provides that “where any slave or slaves, have been, or shall be conveyed given or bequeathed, or have or shall, descend to any feme covert, the absolute right property and interest, of and in such slave or slaves, is hereby vested in the husband of such feme covert; and that where any feme sole .is, or shall be possessed of any slave or slaves, as of her own proper slave or slaves, the same shall accrue to, and be absolutely vested in the husband of such feme,, when she shall marry.” Which makes a further alteration of the property from real to personal, by essentially changing the ownership, where the property has actually come into possession (thereby preventing many of the disputes arising from the notion of their being real property, under the former act:) and where it has not, by giving the husband an inchoate right, which he may enforce in case he survives, as it had been doubted under the former act, whether he,had any right at all. But to complete the scheme of alteration, infants are in the next section, enabled to dispose of slaves by will, at the age of eighteen. Thus declaring them to be personal estate, in almost every instance, that could be named, but descents, entails and dower. By this string of changes, the law instead of declaring that they should be considered as real estate, (except in certain enumerated cases) may now more properly be said, to have, in effect, declared, that *they should be considered as personal property in all cases, except certain enumerated instances.
This idea receives considerable illustration from the following circumstance, that the Legislature, in pursuit of their great object of preserving, and improving estates, in an after clause of the statute, allow a person by deed or will, to annex slaves and their increase, to lands and tenements in fee tail. A provision which would have been unnecessary, if they were to be considered as real estate altogether; and which serves to shew, that, in the Legislative belief, they were, by virtue of the preced *378 ing clauses, restored to.their pristine state of personal property.
Taking them, to be personal property then, and the consequence is, that, by a fixed rule of law, in order to entitle the husband to dispose of them by his will, he must reduce them into possession.
And this leads me to the second question :
There is some clashing in the testimony, relative to the part, which Wishart took in the management of the estate; but the account, most favorable to the. claim of the appellee, only amounts to this, that he qualified as one of the executors in June, in a bad state of heath; that he occasionally visited the plantations; was present, at the appraisement of the estate; and died in August following, without having ever been heard to claim the legacy, or taking the least notice of it, in his will written after the death of Rowley. Which, if it amounted to a possession at all, was a possession as executor, and not in the character of legatee. For the bequest was of an undivided moiety of forty six slaves, residing 'on different plantations, and of which no division had ever been made; nor could well have been, as by law they were to remain on the plantations, to which they respectively belonged, un,til thp last day of December, for' the purpose of finishing the crops.
*1. am consequently of opinion that there was no possession; blit that the slaves survived to the wife; and therefore that the decree of the High Court of Chancery ought to be reversed.
CARRINGTON, Judge.
The Court is now called upon to decide a question, which I did not expect to have heard discussed, at this timé of day; as I had conceived, that the operation of the acts of Assembly,' relative thereto, had long since been understood, acknowledged, and acquiesced in.
It will not be. necessary for me to enter, again, into a critical review and examination of all the different laws upon the subject, as that task, has already, been performed, with great accuracy and ability by the two judges, who. preceded m.e; and therefore it will be sufficient for me to declare my entire approbation of the interpretation, which they, have put. upon the laws; and that' I perfectly concur with them in opinion, that the true effect of. the statutes is, to render slaves personal property, except in those cases, which are particularly enumerated. . .
But it is a rule of the common law, that, al-, though personal chattels aliened to the wife shall go to the husband, ye.t in order to perfect his right, .and complete his title, he must reduce them into possession. 2 Black. Com. 433. It follows therefore, that it was indispensably necessary, that Wishart should have reduced them into possession, or the right survived to the wife, and this has hitherto, as far as I am informed,, been the course of opinion, throughout the state.
But it is said, that the case of a wife surviving her husband, not in possession, has never before been decided, and therefore that it is .a new case. If it be true, that there, has been no former.decision, it can only be accounted for, upon the ground, that the question was considered as so well settled and understood, by the people, that nobody has *ever thought it worth while, to stir it: And I am not much disposed to indulge a construction, which would put all to sea again, and might disturb the titles of thousands.
The principles, however, have been shewn, to have been substantially decided in several cases, in the General Court, under,the former Government; and, notwithstanding the authority of those decisions has been questioned, yet considering, that they are founded in a just and reasonable construction of the act; that they were made in perfect conformity with the public opinion; and have ever since been regarded as rules of property, I certainly consider them as entitled to so much respect, as not to be departed from in the present case; although I do not consider all the decisions, of that court, as binding upon this.
My opinion therefore is, that it was necessary for the appellee to have shewn possession in Wishart; and -he himself will, I imagine, hardly be disposed to find fault with me for it, as he appears to have been of the same opinion himself. For the whole, scope, of the amended bill goes to shew, an assent to the legacy; and by that means to establish, if .possible, a possession in the husband. This too appears to have been Wishart’s own idea; as he did not attempt to devise them, and every body, who had any connection with the estate after him, seems to have thought the same way, until the present suit was brought, .twenty one years after • the transaction. It is .therefore .better to stop the controversy, and not- attempt to move quiet things. ■
The Chancellor,, however, has assumed, .in his.decree, that Wishart was in, possession.- An important fact, if true; and therefore necessary to be inquired into. But what was the possession of which he speaks? At most, (and even that'is not-free from doubt,) he was only possessed as executor. For the testator died between March and December, and by the law, the slaves were to -remain “'on the lands, .until the 25th of December, for the purpose of finishing the crop, until which time, the estate could not well be divided; and, in point of fact, it never was divided in Wishart’s lifetime. So that, if he had any possession at all,-it was in his character of executor, and not as owner.
Upon the whole, I think the decree is erroneous, and must be reversed.
LYONS, Judge.
In determining the present case, it does, not appear, to me, to be important, whether slaves, since the year 1727, are to be considered as real .or personal estate. For, in either case, the words of the act of Assembly will, in my opinion, transfer the right to -the husband.
The case is the first of the kind, which I recollect; and, as far as my knowledge extends, the question has never been decided here .before. It is therefore open to free discussion, and I am sorry to differ in opinion, from my brethren, concerning it. But it is my duty to deliver the opinion I have formed., whether that opinion be right or wrong.
The husband appears to me to have been the principal object of the Legislative care *379 throughout the act of 1727: And an absolute transfer to him, of the wife’s interest, in cases of this kind, seems to have been particularly contemplated by the fourth section. That is to say, the object of the act was to vest the title exclusively in the husband, without leaving any remnant of right in the wife.
The question therefore, seems to be, whether the Legislature, intending to vest the title in the husband immediately, and without regard to the rules of the common law, could do so? Or were bound to observe those rules against their own inclination, and what they supposed would be profitable •to the country?
*There can be no difficulty, I presume, in answering these questions; because all must agree, that, if the Legislature could transfer, at all (which will scarcely be denied) the3 might do it absolutely, or conditionally, and in whatever manner they thought proper. So that it is merely a question of intention; and, upon that, I perceive no difficulty. •
In deciding the cause, it may not be unimportant to observe, that the common law was as well known in the year 1727/the time of passing the explanatory act, as at this day. The Legislature knew full well the condition, upon which a husband obtained an absolute right to the wife’s chattels. They knew, that actual possession, during the coverture,. was necessary-to vest the right in him. That, without it, the chattels survived to the wife, if she outlived him; unless he had assigned them,' for a valuable consideration, during the coverture: And that, if he survived her, he could only take them in character of administrator. ,
Possessed of this knowledge, the Legislature seem to have been disposed to abrogate the rules of the common law altogether, with regard to slaves; and to establish a new system concerning them. So that although possession was before essential, in order to vest the property in the husband, it was, in future, to become unnecessary; and the interest was to be transferred to him, by operation of law, without it.
A few observations will evince this:
The professed intention of both the acts, upon this subject, that is to say, those of 1705 and 1727, was the settlement, and preservation of estates, by uniting slaves and lands in a common course of descents; so that the heir might have the benefit of the labour of the slaves for the improvement of the lands.
*That this was the intention of the Legislature, is proved, not only by the preambles to the statutes, but by the 11th section of the act of 1727; which recites the true design and policy of the former law to have been, to preserve slaves for the use and benefit of the persons, to whom lands and tenements should descend, be given, or devised, for the better improvement thereof; and that the same could not be done, according to the custom and method of improving estates in this country, without slaves. This section embraces, almost in terms, the very observations, which I have been making; and to my mind, establishes,, very clearly, that • the object of the Legislature was such as I have described it.
This being the principle, on which they meant to legislate, it naturally occurred, that as the lands generally belonged to the husband, and not to the wife, the object would be best attained, by transferring the title in the slaves to the husband, so that in case of the premature death of the husband, the proprietor of the lands might be enabled to cultivate them to advantage; which was thought of more importance, than preserving occasional rights of the wife, arising from accidental causes. Hence the prediliction for the interest of the husband beyond that of the wife.
Thus disposed, the Legislature passed the fourth section of the act of 1727, not in corroboration of the rules of the common law, but in express abrogation of them.
It declares that; “Where any slave or slaves, have been or shall be conveyed, given or- bequeathed, or have or shall descend to any feme covert, the absolute right, property and interest of such slave or slaves, is hereby vested, and shall accrue to, and be vested in, the husband of such feme covert.’’
This clause professes to transfer the title and interest, in the slaves, to the husband, without Condition or reservation of any kind; and therefore if the Legislature had both the inclination and the power to make such a transfer, they certainly have effected it, by the extensive terms, which they have used. For the language is express, that the absolute right, property and interest shall be vested in the husband: that is to say, it shall belong to him, free from all conditions and restraints. For if the right, property, and interest is vested in him, he must be the complete and exclusive owner.
But it is said that only the common law rights were given, or rather revived by the act. This however seems to me, to narrow the construction more, than the plain, positive words of the law will admit of, and would render the act useless in many instances. For if the common law rights only were intended, a great proportion of the minute provisions and multiplied details of the act would have been unnecessary. Because, it’would have' been much easier to have declared them personal estate, at once, with the exception of descents, entails, and dower; and to have left it in all other respects ‘subject to the operation of the common law, without the aid of statutory regulations; the only object of which would be to enact the provisions, which the common law would have made without. Especially as, by this means the property would have been liable to known rules, and would not have been perplexed with the difficulties and intricacies; which -might arise in the construction of a string of statutory provisions.
It appears to me therefore, that the intention of the Legislature cannot be mistaken : It must have been to enlarge the rights of the husband; to put him in a better situation than he was at common law; and to transfer all the title of the wife to him- immediately, and without regard to possession -or survivorship. A provision *380 ■calculated to put an end to all disputes between the survivor and the executors relative to the possession, at the same *time, that it comported with the preference shewn for the interest of the husband, throughout the act. A preference which ought to be considered in construing the law; because no rule is better settled, than that the general intention of the Legislature ought to be observed. I conclude' therefore, that the makers of the act intended, that the words, right, property and interest should be understood, according to their full and natural import.
But when all the right- and interest of the wife is transferred to the husband, by plain and positive words, what remains to survive to the wife? To contend that she will take the slaves by survivorship, appears to me to be saying, that the right is transferred out of her, and remains in her, at one and the same time. Which would be absurd and impossible.
I said that the sentence was clear; and in my mind, no difficulty can arise upon it: Ask a plain man the meaning of the words, right, property and interest, in any thing? The answer would be, the complete title to the thing, without condition, reservation or restraint. Ask a lawyer, what those words would mean in a deed, or will? The answer would be, that they conveyed an unconditional- estate. Why then should a more limited construction, • of them, take place in the exposition of a statute? I can see no reason for it, and therefore am not disposed to make a distinction.
Either the estate is vested in the husband by the words of the act, or it is not. If it is, how can it be divested, but by his own deed? And if it is not, what is to be done with the words of the statute? Their operation is destroyed, and they are reduced to mere dead letters.
To obviate this however, a construction was attempted, at the bar, to read the statute distributively; and as the gentleman said, according to the nature of the subject. That is to say, that the word *right should be to the husband as husband, and property and interest should be to him as husband according to the common law; although the word common law is not once mentioned in the whole section. This may do credit to the ingenuity of counsel, but can hardly be considered as tenable by any person, who attentively peruses the statute. For not only, is the supplement unnatural, but it breaks the text; and therefore ought to be rejected. Besides the words of the act vest the title in the husband absolutely, and without reference to anything else. Of course there is no occasion for the supplement ; which is altogether, calculated to defeat the general object of the law.
Besides what is there to lead to this supplement? Suppose instead of saying they should be vested in the husband, the act had said they should be vested in the children or a stranger-, would any body think of saying, in that case, that the right, to the children or stranger, should be to them as children or stranger; and that the property and interest should be to them, as children or stranger according to the common law? And if any body were to sa3 so, what would he mean by it? Certainly no more, than that the right would be to them as children or stranger, and that the property and interest would go to them in the same manner. For the expressions would be synonymous, and the addition of the words “according to the common law,’1 would create no distinction.
To conclude my observations upon the words of the clause.
The statute has said in plain and distinct terms, that the absolute right should be vested in the husband as a substantive individual character, and not as a person cloathed with any particular qualities, or rights, at common law, but that his title shall grow out of the Legislative expression itself: And can I, as a judge, disappoint this declaration of the Legislative will, and lay it under restrictions and qualifications, which the Legislature themselves *have not thought proper to annex to it? I can only say, that I doubt my authority to do so; and that as the expression is plain, I think it ought to be' adhered to; having no idea, that it is in the power of the Court, to reject the force of plain words in a statute.' For the maxim is, that where there iá no ambiguity in the words, there no exposition, contrary to the express words ought to be made.
From what has been said, it ife evident, that it is wholly immaterial, as before observed, whether slaves be considered as real property in general, with certain exceptions of a personal nature, or as personal property in general, with certain exceptions of a real nature. For either way, the words of the act are peremptory; and vest the title in the husband.
It was said, by Mr. Wickham, however, that if this construction prevailed, a difficulty would follow, as slaves would be transmitted neither as real or personal estate; and therefore would have no rules to regulate the succession to them. But I see not the supposed inconvenience; for the succession in all other instances is regulated according to the real or personal quality, which they assume; and with respect to the cases enumerated in this section, the act itself regulates the disposition, and declares the person who is to take, in conformity to the avowed object of the Legislature.
As to the case of Drummond v. Sneed, it was a question of a different kind, arising upon another part of the clause, not well penned, and which, from the words, as of her own proper slave or slaves, looks as if it had been introduced merely to prevent the dower slaves of a wife, from being transferred to the second husband.
I had no difficulty in that case; for I thought the husband entitled several ways. For instance, as the object , was merely to prevent the transfer of the’ dower ■ slaves, I thought the word possessed *might be construed entitled; and then it would be in the same situation with the provisions of the first sentence. Or, if that would not do, that the possession of the tenant for life might be consid *381 ered as the possession of him in remainder; and then the literal expression of the act would be satisfied. By both of which modes, all the parts of the section would be made to harmonize together; and the object of the Legislature would be attained. The judges, however, differed in opinion concerning the case. Some of them thought, that as the wife was not possessed during the coverture, the husband had no right under the act, or at common law. Others thought he had a common law right surviving to him: For myself, as I thought him clearly entitled some way, it was matter of indifference to me, whether it was held that he had the right under the statute or at common law, provided it was held that he had at all. Therefore I concurred in the certificate, that the decree of the County Court should be affirmed; but I did not consider the present question, as having been decided at that time. On the contrary I thought it still open; and reserved for future discussion.
Of course I cannot agree, that that case forms a precedent for this.
The view, which I have taken, of the subject, renders it unnecessary to consider, the other points made in the cause by the counsel for the appellees ; because, accord • ing to my opinion, the act of Assembly vested all the right, property and interest of the wife in the husband absolutely; and in the same manner, as if the slaves had been devised to him immediately.
Of course I think, that, by virtue of the devise to his wife, the testator John Wish-art was entitled to a moiety of the slaves, and that they passed by his will to the plaintiff Wilhelmina and her two brothers. Therefore, I am for affirming the decree.
*PENDELTON, President.
It is clear that slaves were considered as personal estate till 1705; when an act was made declaring them real estate and not chattels. Cases however, are put, as exceptions, in which the converse is to be the rule; that is to say, in which they shall be deemed chattels and not real estate, or in other words, that they shall return to their original nature.
No dispute arose, that I know of, on any of these exceptions: But upon the 6th section doubts were entertained, whether it was confined to mere sales? or was extended to other alienations by deed or will, or by marriage, in alienation of all the wifes personal property?
The words are, “provided also, that no person selling or alienating any such slave shall be obliged to cause such alienation to be recorded, as is required by law' to be done' upon the alienation of other real estate; but that the said sale, or alienation, may be made in the same manner as might have been done before the making of this act.”
Had this clause any other meaning than to dispense with recording sales? If confined to that, it would have made it still necessary on a purchase of slaves to have had a deed, in writing, indented and sealed; but the latter part of the clause restored them to the mode of transferring chattels. So that payment of money, and transmutation of possession, passed the property without any writing.
This however occasioned the various disputes, which produced the explanatory act of 1727.
Altho’ the rules of construction, allow us to reject some words, supply others, or transpose them so as to make the act consist with the design of the Legislature, yet it is said that mere explanatory statutes-cannot be explained. Why? Is not the explained will of the Legislature to be pursued, as much as «their original will, although terms may be used which might import a contrary will?
I proceed to shew, that it was the intention of the act of 1727, that in the case of these alienations by marriage, or otherwise, slaves should be considered as chattels ; and the husband be vested with the same interest (neither more or less) in his wifes slaves, as in her personal estate. Let it be remembered, that the Legislature are explaining the 6th section of the act of 1705, where it is declared that alienations shall be made in the same manner, as before that act. The 3d section is explicit,, that in the case of sales or gifts with or without, deed, or by will, written or nun-cupative, the absolute propert3 shoúld pass t But how? • In the same manner as a chattel.
Having thus, in the 3d section, declared their intention to restore slaves to their personal nature in those kinds of aliena-tions, they proceed, in the 4th section, to the other kind by marriage; and although they do not repeat the words, in the same manner as if such slaves were chattels, probably thinking it unnecessary as they had once declared the principle, yet I will read the clause with those words interposed, in each case of the feme covert and sole.
It will then stand thus “and that where any slave or slaves, have been or shall be conveyed, given or bequeathed, or have or shall descend to any feme covert, the absolute right, property and interest, of such slave or slaves, is hereby vested, and shall accrue to, and be vested in, the husband of such feme covert, in the same manner, as if such slaves were chattels; and that where any feme sole is or shall be possessed of any slave or slaves, as of her own proper slave or slaves, the same shall accrue to, and be absolutely vested in, the husband of such feme, when she shall marry, in the’ same manner, as if such slaves were chattels. ”
«Which removed all difficulty and' will give a meaning to those imperious words absolutely vest; that is, in contra-distinction to the limited interest which the husband has in the wifes real estate.
The doubts which gave rise to the several cases of Wild, Elliot v. Washington, Southall v. Lucas, and Steger v. Mosely, respected remainders of slaves, which vested in interest transmissible in the wife during her coverture, but as there was no right to the possession, as the tenant for life survived the wife, the husbands after the death of the wives, claimed the slaves. The great objection to this claim, under this clause, was, that the property was to vest in the husband of a feme sole, at the *382 time the title commenced, in such slaves, of which she was possessed at the time of the marriage, and this occasioned great difficulty. The clause.in both parts, viewed-as applicable to every supposable case, was easily soluble, by the principle, that slaves were, in these instances to be considered as chattels, making the marital rights of the husband the same in both: And this principle, I ever understood to be established, by the Court; and .have, considered it, as a fixed rule of property tending to quiet disputes.
But it is said the case of the wife surviving, and the .husband not in possession, has never been decided and is a new case open for discussion on the act. Does any gentlemen suppose this a new. case, in fact? and that Mrs. Wishart. was .the first feme, .who survived her husband, .with, her slaves' in this predicament, because Mr. Taliaferro is the first, who has brought on the question for, discussion? X believe the reason of there being no precedent is, that it was never ..doubted, that if the husband was not in possession, and the wife survived, the right was hers: And that in botn the cases mentioned in the clause; for there is no difference.
Yet there is no direct decision on . the point; It was collaterally decided however, in Harrison and wife v. Valentine. Harrison, when *sole was entitled to slaves which then lived with her mother; who, upon one of them, a woman misbehaving, sold her to Valentine, just before the daughter married. Harrison some years after the marriage, brought detinue, in the names of himself and wife, to recover the woman and her children from Valentine; who pleaded the act of limitations. More than five years had elapsed from the marriage but Mrs. Harrison was an infant at the sale, and the suit was within time, after her coming of age. It was insisted for Valentine, that the act vested the right in the husband on .his marriage; that .he had improperly joined the wife; and that her infancy, did not prevent his being barred. It was answered that the act only vested it as a. chattel: That it was still the wifes personal interest which would survive to her if not reduced into, possession during the coverture; and therefore that she was .properly made a party; and that the true question was whether she was barred. The Court was of opinion in favor of the plaintiffs, and gave judgment against Valentine, deciding in fact, that the right would survive to the wife, if not reduced to possession in the husbands life time: The very case now before the Court.
I believe there is no instance of a husband suing, under either part of this clause, in his own name, for his wife’s slaves, without joining her, except Bronaugh v. Cocke. And there the omission was made an objection.
But it is said, that there is no decision on the case, of slaves coming to feme when covert. I ’ recollect none, unless Jones v. Shield was such; whicli .1 do not remember distinctly. I know, that Jones claimed under the first husband against Shield the second husband; but failed here as well as in England. This case happened, before 1727; which might make a difference in the minds of some; although .. none in mine. Because I think the 6th ^section., of the act of 1705,- puts the case on the same footing, as the act of 1727..
A doubt was stated whether the decisions of the old General Court were authority; since although it was our Supreme Court, yet an appeal lay to the King in council. I would ask the gentleman, if it was ever objected to the-authority of the decisions in Westminster Hall, that an appeal lay to the Eords? Where there was an appeal, and the sentence changed, the opinion of the Bords gave. the rules; but in other instances that of the courts did. • Probably some such idea, as the present, produced the cases of Drummond v. Sneed and Hoard v. Upshaw, to discover if the Revolution had produced any change in the legal sentiment: Fortunately, for the peace of the country, the experiment failed; and the point was left at rest. I imagine some young gentlemen of the bar, not old enough to know the practice of the country, nor acquainted with the former decisions, advised this suit, on reading the clause, and being impressed with the force of the strong expressions.
As to the practice, I can truly say, that in my long experience, I do not recollect an instance, where the slaves of a feme covert, or sole, when the right came to her, if they were not taken possession of by the husband, during the coverture, and she survived, were not yielded to her. We find that even the Chancellor, whose opposition to the old decisions is well known, considering the principal to be settled, that slaves- vested only as far as personal estate, has founded his decre’e upon Wishart’s possession. In which, however, I think he is mistaken. The contradiction in the testimony, is about an immaterial fact. Some say, that Taylor was the principal acting executor,, and that Wishart acted but lit■tle: And others that Wishart was the principal acting executor. There is no-doubt, . -but both acted as executors; and neither *of them had any other -possession, than, as executors.
But all this would be a fruitless enquiry, if Mr. Call had been right in his opinion, that in case “of a legacy of a personal chattel to a feme covert,- the - right is - immediately vested in the husband, whether he-gets possession of it or not.” A position so contrary to every idea I had possessed on the subject, that it- surprised me. On'revising his cases, I do not discover the smallest reason to doubt, but that they prove a contrary doctrine: They lay down the general position, that such a legacy devised to the wife vests in the husband; but immediately explain how it vests; that is, subject to the conditions of his reducing it into possession or making a disposition .thereof, in his lifetime, or surviving his wife; otherwise that it will survive to the wife.
Upon the whole, I am of opinion, that the right, to the slaves, survived to the wife in this case; and am happy to find, that this is the opinion of the Court. Since I am satisfied it will tend to confirm long practice ; and preserve the peace of the country; *383 -which would have been disturbed, by a contrary judgment.
The decree was as follows:
“The Court is of opinion, that the interest of the slaves, devised by the will of William Rowley to Lettice Wishart, vested in her husband John Wishart, in the same manner as if they had been chattels and not otherwise, so as to become his property, provided they were reduced into possession, during the coverture, or that he survived his wife, but, if neither happened, the interest survived to his wife. That the said John Wishart during his lifetime had none other possession of the said slaves than as coexecutor with Richard Taylor, they being with the other slaves of the testator, continued on his plantations, under the direction of the executors, *for finishing the crops, according to the directions of the act of Assembly, until after the death of the said Wishart; and no act appears to have been done by him, testifying his election to hold the said slaves in right of his wife and not as executor, and therefore that the right survived to the said Lettice, and that the decree aforesaid is erroneous : Therefore it is decreed and ordered that the same be reversed &c. and this Court proceeding to make such decree as the said High Court of Chancery should have pronounced, it is further decreed and ordered that the bill of the appellees be dismissed &c. ”